**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, 378 N. Main Avenue Tucson, AZ 85701, | |
| Plaintiff, | Case No. |
| v. | **COMPLAINT FOR DECLARATORY AND OTHER RELIEF** |
| DEBRA HAALAND, in her official capacity as Secretary of the U.S. Department of the Interior 1849 C Street, NW Washington, DC 20240, | |
| ELIZABETH KLEIN, in her official capacity as Director of the Bureau of Ocean Energy Management 1849 C Street, NW Washington, DC 20240, | |
| and | |
| KEVIN M. SLIGH, SR. in his official capacity as Director of the Bureau of Safety and Environmental Enforcement 1849 C Street, NW Washington, DC 20240, | |
| Defendants. | |

**INTRODUCTION**

1.  In this case, Plaintiff Center for Biological Diversity challenges the actions and

omissions of Defendants the Secretary of the Interior, Bureau of Ocean Energy Management

Director, and Bureau of Safety and Environmental Enforcement Director (collectively

"Defendants") in managing offshore oil and gas activity in the Gulf of Mexico. Specifically,

Plaintiff challenges Defendants' ongoing failure to comply with the National Environmental

Policy Act (NEPA), 42 U.S.C. §§ 4321–4347, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 555, 701–706, given significant new information and changed circumstances regarding offshore oil and gas decommissioning. Defendants' failures put people, the marine environment, and imperiled species at greater risk from the numerous harms inherent in offshore oil and gas activity.

2.   Decommissioning is the process of ending oil and gas operations, the plugging of wells, and the clean-up and removal of infrastructure used to develop a well. Decommissioning oil and gas infrastructure is critical for environmental protection.

3.   Idle infrastructure (i.e., infrastructure that is no longer in production but has not been decommissioned)[1] poses unnecessary environmental and safety risks, such as increased risk of oil spills. These risks increase over time as offshore infrastructure continues to age and corrode. Unplugged wells, one type of idle infrastructure, also emit harmful pollutants including methane—a powerful greenhouse gas—and can increase explosion risk if gases accumulate.

4.   Because of the numerous harms that idle infrastructure creates, the law requires oil and gas companies to decommission their infrastructure. Oil and gas companies accrue decommissioning obligations when they drill a well or install a platform, pipeline, or other facility in federal waters.

5.   Defendants' regulations generally require oil and gas companies to permanently plug wells, remove platforms and other facilities, and clear the seafloor of all obstructions within one year of lease termination. The regulations also generally require oil and gas companies to decommission any infrastructure that is no longer useful for operations as soon as possible, but

---

[1] For purposes of this Complaint, "idle" infrastructure includes infrastructure on active leases that is considered idle under Defendants' regulations as well as infrastructure on terminated leases.

no later than three years for wells and five years for platforms.

6.  New information reveals that decommissioning is not occurring within the required timeframes or in accordance with other requirements, creating substantial threats to the marine environment. These risks are especially acute in the Gulf of Mexico, where more than 97 percent of offshore drilling in federal waters occurs and thousands of idle wells and hundreds of idle platforms remain.

7.  For example, a recent report revealed that more than 2,700 wells and nearly 500 platforms were overdue for decommissioning in the Gulf of Mexico as of June 2023. Nearly 600 of these idle wells have not even been temporarily plugged to prevent leaks before decommissioning. More than 800 idle wells have sat unused for more than a decade.

8.  Additionally, Defendants have permitted thousands of deviations from decommissioning requirements and permitted more than 97 percent of pipeline mileage in the Gulf of Mexico—totaling about 18,000 miles—to be "decommissioned in place," the term used for permissive abandonment.

9.  Defendants have never conducted a comprehensive analysis of the environmental impacts of idle infrastructure in the Gulf of Mexico, Defendants' permitting oil and gas infrastructure to remain in place, or their permitting of other deviations from their regulations. Instead, on information and belief, Defendants are relying on programmatic NEPA analyses prepared in 1987 and 2005 to evaluate the impacts of Gulf of Mexico decommissioning activities These analyses assume that decommissioning will timely occur in accordance with Defendants' regulations. But that is not the case.

10. Nevertheless, Defendants have not supplemented their programmatic analyses on on Gulf decommissioning nor prepared a new programmatic analysis on such activities. Yet

Defendants continue to permit new oil and gas activity, temporary abandonment of wells, decommissioning in place, and deviations from existing regulatory requirements for decommissioning.

11. Accordingly, Plaintiff seeks a declaration that Defendants are in violation of NEPA and the APA. Plaintiff also seeks an order requiring Defendants to complete a new NEPA analysis by a date certain. Only with the new, comprehensive analysis that NEPA demands can Defendants possibly understand how to best manage offshore oil and gas activity considering the mess of leaky wells, rusty platforms, and corroding pipelines that the oil and gas industry has created in the Gulf of Mexico. And until Defendants complete this required analysis, the public will continue to be left in the dark about the true dangers posed by offshore oil and gas activity.

## JURISDICTION AND VENUE

12. The Court has jurisdiction over this matter under 28 U.S.C. § 1331 because this case presents a federal question under the laws of the United States, including NEPA and the APA. An actual, justiciable controversy now exists between Plaintiff and Defendants, and the requested relief is proper under 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 701–706.

13. Venue in this Court is proper under 28 U.S.C. § 1391(e) because Defendants reside in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## PARTIES

### Plaintiff

14. Plaintiff Center for Biological Diversity (the "Center") is a national conservation organization that advocates for the protection of threatened and endangered species and their habitats through science, law, and policy. The Center's mission also includes protecting air

quality, water quality, and public health. The Center has over 79,000 members worldwide. The Center brings this action on behalf of its members.

15. The Center's Oceans Program focuses specifically on conserving marine ecosystems and seeks to ensure that imperiled species such as marine mammals, sea turtles, and seabirds are properly protected from destructive practices in our oceans. The Oceans Program also works to protect coastal communities from the air pollution, water pollution, and other impacts that result from such practices. In pursuit of this mission, the Center has been actively involved in protecting the Gulf of Mexico from offshore oil and gas drilling activity.

16. The Center's members live near and regularly visit the Gulf of Mexico, its beaches, and the waters near offshore platforms, for vocational and recreational activities such as swimming, kite surfing, fishing, and viewing and studying wildlife like sea turtles, seabirds, manatees, whales, dolphins, corals, and other animals. The Center's members derive recreational, spiritual, professional, scientific, educational, and aesthetic benefits from their activities in these areas. Their enjoyment depends on the health and condition of the environment and wildlife that migrate through and live in the area. The Center's members intend to continue to use and enjoy these areas frequently and on an ongoing basis in the future. The Center's members also enjoy seeing species that visit the Gulf of Mexico when those species have migrated to or are migrating through other parts of the country.

17. For example, one Center member lives in Texas and regularly uses the Gulf of Mexico to go swimming, kite surfing, and to observe and look for wildlife including Kemp's ridley sea turtles, green sea turtles, loggerhead sea turtles, whopping cranes, and other wildlife. He goes to beaches where Kemp's ridleys nest to see these turtles and has participated in efforts to protect sea turtle nests and rehabilitate and release injured sea turtles back into the wild.

Another Center member lives in Florida and travels throughout the state in the hopes of seeing wildlife, including manatees, and regularly photographs manatees while diving in their habitat. Another Center member is an avid bird watcher and has traveled to Maryland, Texas, Louisiana, Florida, Virginia, Delaware, and New Jersey to see coastal waterbird species, including eastern black rails. These members intend to regularly engage in these activities for the foreseeable future.

18. Offshore oil and gas drilling activities in the Gulf of Mexico degrade these habitats and threaten wildlife and the coastal environment and therefore adversely affect the Center's members' use and enjoyment of these areas. Idle infrastructure and decommissioning in place increase these harms. Unplugged or improperly plugged wells increase the risks of oil spills; the cement and steel that make up the wellbore degrade over time, leading to spills or leaks contaminating the ocean environment. In some situations, the gases in unplugged wells can accumulate, increasing the risk of explosions. These risks are heightened if unplugged wells are near new oil and gas development using hydraulic fracturing due to the high pressures used. Idle infrastructure also increases the risk of spills from storms. Offshore oil and gas infrastructure can become badly damaged in strong winds, as evidenced by the oil spill from an abandoned Taylor Energy platform following Hurricane Ivan that leaked oil for 15 years. Oil spills can kill the wildlife that the Center's members enjoy, as evidenced by the Deepwater Horizon oil spill that killed tens of thousands of sea turtles, tens of thousands of marine mammals, hundreds of thousands of birds, an untold number of fish and corals, and is still negatively affecting the recovery of numerous species nearly 15 years later.

19. Unplugged wells can also leak methane. Methane does not dissipate in the water when

leaking from wells in less than 1,000 meters of water, instead bubbling to the surface and joining the atmosphere as a gas. Methane leaking from wells in these shallower waters contributes to climate change and exacerbates harms to species already suffering the effects of climate change, such as sea turtles losing their nesting beaches from sea level rise. Methane leaks also harm fish and other wildlife.

20. These risks and harms constitute concrete, particularized, and imminent injuries to the interests of the Center's members. The above-described aesthetic, recreational, professional, spiritual, and other interests have been, are being, and will continue to be adversely affected and irreparably injured by Defendants' failure to comply with NEPA. Defendants' management and authorization of Gulf of Mexico oil and gas decommissioning without proper review of the environmental impacts of decommissioning means Defendants are failing to adequately protect the Gulf of Mexico and already imperiled wildlife, exposing them and the coastal environment to increased pollution and risk of harm from oil spills, methane leaks, and other accidents.

21. In addition, the Center's members are suffering procedural and informational injuries resulting from Defendants' failure to conduct supplemental environmental review on Gulf decommissioning. The Center's members regularly comment on agency actions that affect the Gulf of Mexico, and regularly comment on and participate in Defendants' decisions regarding oil and gas activity and their environmental analyses under NEPA. Defendants' failure to comply with NEPA deprives them of their right to meaningfully participate in these comment periods and deprives them of the information that should be obtained through the NEPA process. These deprivations cause them procedural and informational injuries.

22. The Center's members have no adequate remedy at law and the requested relief

is proper. Relief in this case would ensure Defendants engage in new NEPA analysis to analyze

the impacts of Gulf of Mexico oil and gas decommissioning. The requested relief would result in

additional information and process and could result in additional mitigation and oversight of oil

and gas decommissioning that would better protect the ocean and imperiled wildlife and help

alleviate the injuries of the Center's members.

## Defendants

23. Defendant Debra Haaland is the Secretary of the U.S. Department of the Interior and

is sued in her official capacity. Secretary Haaland directs all business of the Department of the

Interior and is the official ultimately responsible under federal law for ensuring that the

Department of the Interior's actions comply with all applicable laws and regulations, including

NEPA and the APA.

24. Defendant Elizabeth Klein is the Director of the Bureau of Ocean Energy Management

(BOEM) and is sued in her official capacity. BOEM is a federal agency within the Department of

the Interior. BOEM is one of the agencies to which the Secretary of the Interior has delegated

responsibilities under the Outer Continental Shelf Lands Act. BOEM is charged with managing

the development of offshore resources, including oil and gas exploration and development and

production in federal waters. As Director of BOEM, Elizabeth Klein has responsibility for

implementing and fulfilling BOEM's duties under all applicable laws and regulations, including

NEPA and the APA.

25. Defendant Kevin M. Sligh, Sr. is the Director of the Bureau of Safety and

Environmental Enforcement (BSEE) and is sued in his official capacity. BSEE is a federal

agency within the Department of the Interior. BSEE is charged with permitting the drilling of

wells and ensuring such activities comply with safety and environmental regulations. As Director

of BSEE, Kevin M. Sligh Sr. has responsibility for implementing and fulfilling BSEE's duties under all applicable laws and regulations, including NEPA and the APA.[2]

## LEGAL BACKGROUND

### Outer Continental Shelf Lands Act

26. The Outer Continental Shelf Lands Act (OCSLA) establishes a framework under which the Secretary of the Interior may lease areas of the outer continental shelf for purposes of exploring and developing oil and gas deposits. 43 U.S.C. §§ 1331–1356b. The outer continental shelf generally begins three miles from shore—the outer boundary of most state waters—and extends seaward to the limits of federal jurisdiction. *Id*. § 1331(a).

27. OCSLA requires that oil and gas exploration and production be "subject to environmental safeguards" and balanced "with protection of the human, marine, and coastal environments." *Id*. §§ 1332(3), 1802(2).

28. OCSLA establishes four distinct stages to developing an offshore well: "(1) formulation of a 5-year leasing plan …; (2) lease sales; (3) exploration by the lessees; [and] (4) development and production." *Sec'y of the Interior v. California*, 464 U.S. 312, 337 (1984). Prior to drilling a well, an oil and gas company must also obtain a permit to drill. 30 C.F.R. §§ 550.281(a)(1), 250.410. After the end of production or when leases are relinquished or terminated, oil and gas companies must decommission wells, pipelines, and platforms.

29. OCSLA vests the Secretary with the authority to issue regulations implementing the

---

[2] BOEM and BSEE used to exist as one agency called the Minerals Management Service. *See* 76 Fed. Reg. 64,432 (Oct. 18, 2011). The Secretary of the Interior restructured the agency in 2010 following the Deepwater Horizon oil spill; and the Minerals Management Service was renamed the Bureau of Ocean Energy Management, Regulation and Enforcement until the reorganization became effective. *See id.*

statute. 43 U.S.C. § 1334(a). OCSLA specifies that such "regulations shall, as of their effective date, apply to all operations conducted under a lease." *Id.*

30. The Secretary has delegated its responsibilities under OCSLA to two bureaus within the Department of the Interior. BOEM is responsible for managing leasing, exploration, development, and production of oil and gas resources on the outer continental shelf. 30 C.F.R. § 550.101. BSEE is responsible for enacting and enforcing safety and environmental standards under OCSLA, as well as approving drilling permits. *Id.* § 250.101.

31. OCSLA's implementing regulations establish procedures for oil and gas decommissioning. 30 C.F.R. §§ 250.1700–250.1754.

32. Oil and gas companies accrue decommissioning obligations when they "(a) Drill a well; (b) Install a platform, pipeline, or other facility; (c) Create an obstruction to other users of the [outer continental shelf];" or become a lessee or owner of such facilities, among other situations. *Id.* § 250.1702.

33. The regulations define "decommissioning" as "(1) Ending oil, gas, or sulphur operations; and (2) Returning the lease, pipeline right-of-way, or the area of a right-of-use and easement to a condition that meets the requirements of BSEE" and other applicable laws and regulations. *Id.* § 250.1700.

34. The regulations require oil and gas companies to "permanently plug all wells on a lease within 1 year after the lease terminates." *Id.* § 250.1710. The regulations specify that BSEE will also require that wells be permanently plugged when the well "[p]oses a hazard to safety or the environment; or [i]s not useful for lease operations and is not capable of oil, gas, or sulfur production in paying quantities." *Id.* § 250.1711.

35. The regulations specify how companies must permanently plug wells based the

specific type of equipment used and other variables. *Id.* § 250.1715(a).[3]

36. The regulations require oil and gas companies to "remove all platforms and other facilities within 1 year after the lease, pipeline right-of-way, or right-of-use and easement terminates" unless the company "receive[s] approval to maintain the structure to conduct other activities." 30 C.F.R. § 250.1725(a). "Facility" means "any installation other than a pipeline used for oil, gas, or sulfur activities that is permanently or temporarily attached to the seabed." *Id.* § 250.1700(c).

37. The regulations also require that when "facilities are no longer useful for operations," oil and gas companies must "[p]ermanently plug all wells …; [r]emove all platforms and other facilities [unless one of two specific exceptions apply]; [d]ecommission all pipelines; [and] [c]lear the seafloor of all obstructions." *Id.* § 250.1703(b)–(e). The two specific exceptions for fully removing platforms are if the company receives (1) approval to conduct other activities using the facilities or (2) approval to partially remove the platform or to topple it in place for conversion to an artificial reef. *Id.* §§ 250.1703(c), 250.1725(a), 250.1730.

38. The regulations do not define "what no longer useful for operations" means. BSEE has a guidance document interpreting this phrase for wells to mean that:

> (a) the well has not been used in the past 5 years (i) for operations associated with the exploration for or the development and production of oil, gas, sulphur, or other mineral resource or (ii) as infrastructure to support such operations; and (b) [the company has] no plans to use the well (i) for operations associated with the exploration for or the development and production of oil, gas, sulphur, or other mineral resource, or (ii) as infrastructure to support such operations.

---

[3] The regulations also provide for the temporary plugging of wells when temporarily abandoning the well "is necessary for proper development and production of a lease." 30 C.F.R. § 250.1721. The regulations specify how an oil and gas company should temporarily plug a well. *See id.*

BSEE, Idle Iron Decommissioning Guidance for Wells and Platforms, NTL No. 2018-G03 at 2 (Dec. 11, 2018), https://www.bsee.gov/sites/bsee.gov/files/notices-to-lessees-ntl//ntl-2018-g03.pdf. That guidance document also specifies that when a well is "no longer useful" and "no longer capable of producing oil [or] gas … in paying quantities," oil and gas companies must generally permanently plug a well within three years. *Id.*

39. That guidance interprets "no longer useful" for platforms to mean that

> the platform has (a) been toppled or otherwise destroyed; or (b) not been used in the past 5 years (i) for operations associated with the exploration for or the development and production of oil, gas, sulphur, or other mineral resource, (ii) as infrastructure to support such operations, or (iii) for other energy- or marine - related purposes as authorized by BSEE or [BOEM].

*Id.* The guidance specifies that once a platform is no longer useful, oil and gas companies should decommission it as soon as possible, but no later than five years after it is no longer useful. *Id.*

40. BSEE can permit a pipeline to be decommissioned in place if it determines that certain conditions are met: "that the pipeline does not constitute a hazard (obstruction) to navigation and commercial fishing operations, unduly interfere with other uses of the [outer continental shelf], or have adverse environmental effects." 30 C.F.R. § 250.1750.

41. BOEM's lease form for oil and gas leases on the outer continental shelf mirrors the regulatory requirements. The lease requires that "[w]hen wells, platforms, pipelines or other facilities are no longer useful for operations," lessees must permanently plug wells, remove platforms and other facilities, decommission pipelines "and clear the seafloor of all associated obstructions created by the lease operations." Form BOEM-2005 at 4 (Feb. 2017), https://www.boem.gov/sites/default/files/about-boem/Procurement-Business-Opportunities/BOEM-OCS-Operation-Forms/BOEM-2005.pdf. It also specifies that the Secretary can require the immediate decommissioning of wells, platforms, or pipelines upon

determining they are no longer useful for operations; and that "[a]ll platforms and other facilities shall be removed within 1 year after the lease terminates" unless the lessee receives permission "to conduct other activities." *Id.*

42. The regulations require oil and gas companies to obtain permission from BSEE before decommissioning wells, platforms, and other facilities. 30 C.F.R. § 250.1703(a).

43. BOEM and BSEE must comply with NEPA in managing oil and gas activity under OCSLA, including decommissioning activities.

**National Environmental Policy Act**

44. NEPA is "the basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a) (2024).[4] Its goals are to (1) "prevent or eliminate damage to the environment and biosphere," (2) "stimulate the health and welfare" of all people, and (3) "encourage productive and enjoyable harmony between [hu]man[kind] and [the] environment." 42 U.S.C. § 4321.

45. NEPA requires federal agencies to take a "hard look" at the environmental consequences of their actions before acting. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (citation omitted). In this way, NEPA ensures that federal agencies "will have available, and will carefully consider, detailed information concerning significant environmental impacts" and that such information "will be made available to the larger [public] audience that may play a role in both the decisionmaking process and the implementation of that decision." *Id*. at 349.

46. To this end, NEPA requires federal agencies to prepare a detailed environmental

---

[4] The Council on Environmental Quality issues regulations implementing NEPA that are binding on all federal agencies. 40 C.F.R. § 1500.3(a). Those regulations have undergone various amendments in recent years. *See* 89 Fed. Reg. 35,442 (May 1, 2024). None of those amendments affect the claims at issue here, however, so Plaintiff cites the latest regulations, effective as of July 1, 2024. *See id.* at 35,573.

impact statement (EIS) for any "major federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). A "major federal action" is defined as "an action that the agency carrying out such action determines is subject to substantial Federal control and responsibility." *Id.* § 4336e(10)(a).

47. An EIS must describe the "reasonably foreseeable environmental effects of the proposed agency action." *Id*. § 4332(2)(C)(i).

48. Environmental effects include direct, indirect, and cumulative effects. 40 C.F.R. § 1508.1(i). Direct effects are those that "are caused by the action and occur at the same time and place." *Id.* § 1508.1(i)(1). Indirect effects are those that "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable," such as "growth-inducing effects." *Id.* § 1508.1(i)(2). Cumulative effects are the "effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id.* § 1508.1(i)(3). Such effects "can result from actions with individually minor but collectively significant effects taking place over a period of time." *Id.*

49. An EIS must also examine "a reasonable range of alternatives to the proposed agency action," including the alternative of not taking the underlying proposed action. 42 U.S.C. § 4332(C)(iii). The alternatives analysis is considered "the heart of the [EIS]." 40 C.F.R. § 1502.14. In conducting such analysis, the agency "should sharply define the issues for the decision maker and the public and provide a clear basis for choice among options." *Id.*

50. The EIS is an "action-forcing device" that ensures NEPA's goals "are infused into the ongoing programs and actions" of the federal government. 40 C.F.R. § 1502.1(a).

51. To determine whether the environmental impact of a proposed action may be

"significant" and thus warrant preparation of an EIS, an agency may prepare an "environmental assessment." *Id*. § 1501.5(a)–(b). An environmental assessment must "[b]riefly discuss the … [p]urpose and need for the proposed agency action; … [and the] [e]nvironmental effects of the proposed action and alternatives." *Id.* § 1501.5(c)(2).

52.     An agency must prepare an EIS if substantial questions are raised whether a project *may* have a significant effect upon the environment. *Id*. §§ 1502.3, 1508.1(b).

53. The regulations specify that an agency "can prepare programmatic environmental documents," including programmatic EISs and programmatic environmental assessments, "to evaluate the environmental effects of policies, programs, plans, or groups of related activities." 40 C.F.R. § 1501.11(a). An agency can use a programmatic analysis to, *inter alia*, "evaluate widely applicable measures; or avoid duplicative analysis for individual actions by first considering relevant issues at a broad or programmatic level." *Id.* The regulations state that a programmatic analysis can be used for "[n]ational or regional actions; … [a]ctions that have multiple stages or phases, and are part of an overall plan or program; or … [a] group of projects or related types of projects," among other situations. *Id.* § 1501.11(a)(2)(iii)–(v).

54. An agency's NEPA obligations do not end with the issuance of an EIS or environmental assessment and finding of no significant impact. Agencies are required to prepare a supplemental NEPA analysis "if a major Federal action is incomplete or ongoing, and (i) The agency makes substantial changes to the proposed action that are relevant to environmental concerns; or (ii) There are substantial new circumstances or information about the significance of adverse effects that bear on the analysis." *Id*. §§ 1502.9(d)(1);[5] *see also id.* § 1501.5(h)(1). An

---

[5] The previous version of this regulation stated that "if a major federal action remains to occur." 40 C.F.R. §1502.9(d)(1) (2020).

agency also has the discretion to prepare a supplemental EIS or environmental assessment when it "determines that the purposes of [NEPA] will be furthered by doing so." *Id.* §§ 1502.9(d)(2), 1501.5(h)(2).

55. When an agency has prepared a programmatic analysis, and takes a subsequent, site-specific action under that program, the agency's NEPA analysis on the site-specific action can tier back to that programmatic analysis to avoid duplication and focus on effects not fully addressed at the programmatic scale. *Id.* § 1501.11(b). An agency cannot, however, lawfully tier to a prior NEPA analysis if that analysis does not take the requisite hard look at the environmental impacts of the action under review.

56. Recent amendments to NEPA specify the circumstances in which an agency can continue to rely on a previously prepared programmatic analysis. Specifically, an agency can continue to rely on such analysis "[w]ithin 5 years and without additional review of the analysis in the programmatic environmental document, unless there are substantial new circumstances or information about the significance of adverse effects that bear on the analysis." 42 U.S.C. § 4336b(1). The agency can continue to rely on such analysis "[a]fter 5 years, so long as the agency reevaluates the analysis in the programmatic environmental document and any underlying assumption to ensure reliance on the analysis remains valid." *Id.* § 4336b(2).

57. The regulations also provide for the use of categorical exclusions in certain situations. A categorical exclusion is "a category of actions that an agency has determined" pursuant to certain prescribed procedures "normally does not have a significant effect on the human environment." 40 C.F.R. § 1508.1(e). If an action falls within an existing categorical exclusion, an agency is typically excused from preparing an EIS or environmental assessment "unless extraordinary circumstances exist that make application of the categorical exclusion

16

inappropriate." *Id.* § 1501.4(a).

58. "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." 40 C.F.R. § 1500.1(b).

## Administrative Procedure Act

59. The APA governs judicial review of federal agency actions. 5 U.S.C. §§ 701–706.

60. Under the APA, a person may seek judicial review to "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

61. Also under the APA, courts "shall … hold unlawful and set aside agency action … found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." *Id.* § 706(2)(A), (D).

## FACTUAL BACKGROUND

### The Gulf of Mexico Environment

62. The Gulf of Mexico is home to a diverse set of ecosystems including coral reefs, wetlands, oyster beds, mangroves, and deep-water seeps. These ecosystems support a staggering array of marine life and significantly contribute to the Gulf coast economy.

63. Thousands of marine species live in the Gulf of Mexico, ranging from dolphins, whales, sea turtles, seahorses, and other fish to seafloor communities of deep-sea corals, sea anemones, sponges, and sea stars. It is also an important migratory route for birds—studies have shown that over two billion birds migrate across the Gulf each spring.

64. Many of the species found the Gulf of Mexico are protected under the Endangered Species Act. This includes marine species such as the sperm whale, Rice's whale (formally known as the Gulf of Mexico Bryde's whale), and West Indian manatee; elkhorn, staghorn, and boulder corals; the oceanic whitetip shark, Nassau grouper, and giant manta ray; and leatherback,

green hawksbill, Kemp's ridley, and loggerhead sea turtles. The whopping crane, eastern black rail, and black-capped petrel, and other bird species that live in or migrate through the Gulf of Mexico are also protected under the Endangered Species Act.



Photo: Kemp's ridley sea turtle, National Marine Fisheries Service



Photo: Manatee, U.S. Fish and Wildlife Service

**Oil and Gas Activity in the Gulf of Mexico**

65. The Gulf of Mexico is also where nearly all oil and gas activity on the nation's outer continental shelf occurs. Oil and gas drilling in the Gulf of Mexico generates roughly 97 percent

of all oil and gas production on the outer continental shelf.

66. Defendants held 187 oil and gas lease sales under OCSLA between 1953 and 2023. Three additional oil and gas lease sales in the Gulf of Mexico are included in the current five-year leasing plan: one in 2025, one in 2027, and one in 2029.

67. According to federal estimates, each new oil and gas lease sale results in up to roughly 1,750 new wells, 280 new production structures, 1,330 miles of new pipelines, and the development of up to 1.12 billion barrels of oil and 4.42 trillion cubic feet of gas.

68. As of July 1, 2024, there are 2,360 active oil and gas leases in the Gulf of Mexico across nearly 13 million acres. As of July 7, 2024, there are 1,452 active platforms in the Gulf of Mexico, 1,381 of which are in waters less than 200 meters deep, and 1,415 of which are in waters less than 1,000 meters deep. There are also hundreds of inactive platforms and thousands of inactive wells.



Department of Energy. Map of the locations of platforms in the northern Gulf of Mexico symbolized by structure type including fixed, mobile offshore production units (MOPU), and unknown (as of December 2019).

69. According to a 2024 report from the Government Accountability Office, over 75 percent of Gulf of Mexico offshore oil and gas infrastructure is overdue for decommissioning. That report found that more than 2,700 wells and nearly 500 platforms were overdue for decommissioning as of June 2023. This includes infrastructure that is required to be decommissioned because it is part of a lease that has been terminated for at least a year or has been idle for the time specified in BSEE's guidance.

70. More than 800 of the 1,000 idle wells overdue for decommissioning have not been used for over a decade. Many of these wells have not been used in more than 30 years. Nearly 600 of the 1,000 idle wells overdue for decommissioning have not even been temporarily plugged to prevent leaks.

71. A 2023 study that looked at idle oil and gas wells in the Gulf of Mexico found that there are more unplugged, non-producing wells than there are currently producing wells. That study estimated that there are 14,000 unplugged, non-producing wells in the Gulf of Mexico, more than 7,000 of which are in federal waters. This includes more than 6,200 in waters less than 1,000 meters deep.

72. A 2021 Government Accountability Office report found that BSEE has permitted more than 97 percent of pipeline mileage to be decommissioned in place, totaling roughly 18,000 miles-worth of pipelines. That report also noted that between 2015 and May 2020, BSEE approved 777 of 813 applications to decommission pipeline segments in place. BSEE continues to approve decommissioning in place. BSEE approved more than 400 permits to abandon pipelines in place between April 1, 2019, and March 31, 2024.

73.     BSEE also permits oil and gas companies to deviate from the decommissioning regulations in other ways. For example, BSEE approved more than 2,700 alternative compliance,

departures, and time extensions from the decommissioning regulations between June 15, 2020, and March 31, 2024.

**The Dangers of Idle Oil and Gas Infrastructure and Delayed Decommissioning**

74. While the dangers of idle offshore oil and gas infrastructure or of decommissioning in place have not been extensively studied, available information indicates there are several significant environmental impacts.

75. For example, idle infrastructure increases the risk of oil spills and other accidents, increases methane pollution, and increases seabird injury and death from collisions with platforms and other infrastructure.

76. The average age of platforms in the Gulf of Mexico is more than 35 years old. Offshore oil and gas infrastructure is typically designed for a 20 to 30-year life.

77.    Aging increases risks of corrosion, erosion, and fatigue stress to subsea pipelines. These impacts accelerate over time and can act synergistically to increase the rate of crack propagation. Marine environments are especially likely to significantly corrode steel surfaces, and when a steel structure is at or beyond its elastic limit, the rate of corrosion increases 10 to 15 percent. One offshore pipeline study found that after 20 years the annual probability of pipeline failure increases rapidly, equating to a probability of failure of 10 percent to 100 percent per year. Another study covering 1996 to 2010 found that accident incident rates, including spills, increased significantly with the age of infrastructure. Offshore pipelines can also face more corrosion than onshore pipelines due to higher temperature and pressure conditions that occur during the laying of these pipelines.

78. Older wells can also lead to oil spills or other accidents. For example, one study found that 30 percent of offshore oil wells in the Gulf of Mexico experienced well casing

damage in the first five years after drilling, and damage increased over time to 50 percent after

20 years. Another study determined about five percent of oil and gas wells leak immediately, 50

percent leak after 15 years, and 60 percent leak after 30 years.

79. The structural integrity of platforms, wells, and pipelines also decline with exposure to

storms, including hurricanes that are common in the Gulf of Mexico. For example, Hurricane

Ivan triggered a catastrophic event impacting the Taylor Energy–abandoned oil platform located

12 miles off the Louisiana coast. A mudslide caused by the hurricane severed the platform's legs,

leading to its complete collapse onto the seabed and subsequent damage to 28 underlying wells.

This incident initiated the longest-running oil spill in U.S. history, with continuous leakage for

more than 15 years. Hurricane Katrina moved nine miles of a 22-mile-long buried pipeline as far

as 4,000 feet out of place. Together, Hurricane Katrina and Rita destroyed or damaged nearly

300 platforms in the Gulf of Mexico. Climate change is increasing the intensity of storms in the

Gulf of Mexico, with the 2024 hurricane season already setting records. The risk of spills from

idle infrastructure, including from unplugged or improperly plugged wells, is increasing as

hurricanes become more severe because of climate change.



Image, Government Accountability Office 2024

80. Scientists have also determined that the risk of spills from inactive wells increases when they are located near active oil and gas development using hydraulic fracturing ("fracking"). This increased risk is due to increased fluid pressures and the resulting newly generated fractures. One extreme example on land involved the fracking of a nearby well causing a 30-foot geyser of oil field brine to spout for a week from an abandoned well. This is a significant concern in the Gulf of Mexico, where BOEM estimates more than 65 percent of wells are fracked and inactive wells are located in proximity to active wells.

81. Oil spills harm wildlife in a variety of lethal and sublethal ways. Oil can coat animals' fur, feathers, or skin, impairing their insulation, water repellency, or breathing. Animals can also ingest or inhale oil, causing poisoning, organ damage, or respiratory problems. Moreover, oil can contaminate the water and the seafloor and damage habitat for corals, fish, and other animals.

82. Unplugged or temporarily plugged wells can leak methane. One recent study using methane imaging of oil and gas platforms in shallow areas of the Gulf of Mexico determined that offshore platforms have a "methane loss rate"—a calculation of methane pollution relative to reported extraction—of 23 to 66 percent, substantially more than previously understood. While that study did not differentiate between active and inactive wells, other new science indicates that inactive wells may be a significant source of methane leakage. For example, one study examining 43 inactive wells in the North Sea found that 28 of them—or more than 65 percent of the wells—were leaking methane.

83. During underwater gas leakages, some of the methane bubbles up to the surface and evaporates into the atmosphere. Methane is a potent greenhouse gas pollutant. Methane is 87 times more powerful than carbon dioxide at warming the atmosphere over a 20-year period. Methane is second only to carbon dioxide in driving climate change during the industrial era.

Scientists have recently concluded that methane leakage from inactive offshore oil and gas wells may be a significant source of regional greenhouse gas emissions, especially in wells in water less than 1,000 meters deep. As such, methane emissions from idle wells exacerbate harm from climate change, including sea level rise that is destroying nesting habitat for Kemp's ridley and loggerhead sea turtles.

84. The methane that does not rise to the surface dissolves in the water, and can be toxic to marine life. For example, methane molecules can rapidly penetrate the bodies of fish, causing direct damage to gills, skin, and eyes, and filling up the gas bladder, which compromises the capacity of fishes to control buoyancy, impacting fitness and survival. In addition, high concentrations of gas such as methane create dead zones by promoting localized hypoxia (i.e., low oxygen) around the release site, negatively affecting the survival of marine species. For example, there is scientific evidence of localized dead zones in the Gulf of Mexico created by high concentrations of methane leaked from the Deepwater Horizon oil well blowout.

85. Aging infrastructure can also lead to the deposition of corroded metal and organic compounds into the ocean environment. Mercury and cadmium—among the most toxic heavy metals—can be released. Poly aromatic hydrocarbons (PAH) may be in the pipelines' corrosion-protective layer, made of asphalt or coal tar, which can also be released into the marine environment. PAHs induce a wide variety of detrimental effects in aquatic organisms including reproductive harm, compromised immune system function, cancer, and death from acute toxicity. These harms impact a variety of species, including invertebrates, fish, reptiles, birds, and marine mammals.

86. The known and potential harms from idle infrastructure and decommissioning in place are of significant concern for numerous species, including species protected under the

Endangered Species Act. The habitat of Rice's whales, sperm whales, and sea turtles overlaps

with idle wells and platforms as well as pipelines that have been decommissioned in place. The

risks to these already imperiled species are heightened not only for the reasons listed above, but

also because, according to a 2021 report from the Government Accountability Office, BSEE

"does not have a robust process to address the environmental and safety risks posed by leaving

decommissioned pipelines in place on the seafloor due to the cumulative effects of oversight

gaps before, during, and after the decommissioning process."



Map by Center for Biological Diversity, 2024. Bright green area is Rice's whale habitat, light green area is sperm whale core habitat, and purple area is logger head critical habitat. The red triangles are the locations of pipelines decommissioned in place, the gray boxes are platforms overdue for decommissioning, and the orange circles are wells overdue for decommissioning.

87. Idle platforms also increase the risk of injury and death of seabirds. Seabirds

frequently collide with lights or structures around lights causing injury or mortality. BOEM has

estimated that platforms in the Gulf of Mexico kill at least 200,000 birds each year via collisions,

equating to approximately 50 birds per platform. Another recent study assessed the relative

vulnerability to oil of 24 seabird species and found a roughly 89 percent overlap of oil and gas platforms within seabird habitat, indicating there is a high potential for seabirds to interact with any oil and gas platform. In addition, light pollution from platforms and other lighted structures poses a threat to seabirds. A new scientific analysis shows that light attracts seabirds at night and disrupts their normal foraging and breeding activities, among other problems.

### No Existing NEPA Analysis Examines the New Information and Changed Circumstances Regarding Gulf Decommissioning

88. None of Defendants' prior NEPA analyses on oil and gas activities in the Gulf of Mexico examine the potential direct, indirect, and cumulative effects of delays in decommissioning oil and gas infrastructure. None of Defendants' prior NEPA analyses on oil and gas activities in the Gulf of Mexico examine the effects of the hundreds of idle wells that have not been permanently or even temporarily plugged, nor do they examine the effects of idle platforms and other facilities. None of Defendants' prior NEPA analyses on oil and gas activities in the Gulf of Mexico examine the effects of permitting nearly all pipeline mileage to be decommissioned in place.

89. In 2005, Defendants issued a programmatic environmental assessment (PEA) examining the impacts of Gulf oil and gas decommissioning activities. Specifically, the 2005 PEA examined the potential environmental impacts of "structure-removal activities" on the Gulf outer continental shelf, including "platform removals and well, pipeline, and mooring severances." That analysis supplemented an earlier programmatic environmental assessment that Defendants completed in 1987.

90. Defendants stated the updated 2005 analysis was needed because the earlier analysis only examined the removal of certain types of structures; only examined removal operations in water depths less than 200 meters; and that the methods used to decommission, and the

regulatory requirements, had changed since the 1987 PEA. The 2005 PEA states that the push into deepwater expanded the area of the proposed action beyond what was examined in the 1987 PEA and could affect threatened and endangered species near deep water structures, such as the sperm whale. The 2005 PEA states that Defendants "will analyze all of the applicable activities related to [Gulf of Mexico] decommissioning operations as a single proposed action."

91. The 2005 PEA states that Defendants will "rely on the analysis … to ensur[e] that adequate environmental reviews are conducted on all decommissioning proposals that would help support human health and safety while simultaneously protecting the sensitive marine environment" and "serv[e] as a reference document to implement the 'tiering' objective detailed in NEPA's implementing regulations." It further states that "[a]s a programmatic document, the alternatives analyzed in th[e] PEA are required to address a broad range of activities that could occur during [Gulf of Mexico] decommissioning operations."

92. The 2005 PEA expressly states that it does not analyze an "Abandonment Only" alternative, under which infrastructure on expired leases would be left in place, because such alternative is inconsistent with OCSLA's implementing regulations.

93. The 2005 PEA also states that "[t]he opportunity does exist for the abandonment-in-place of certain seafloor obstructions," but that "the obstructions are limited to water depths greater than 800 [meters] and need to be addressed on a case-by-case basis." It further notes that oil and gas companies can get permission to convert to a platform to an artificial reef, but that "Abandonment in Place" is the "least likely option and only in areas of strategic importance."

94. The 2005 PEA states the number of permanently plugged wells between 1994 and 2003; it does not disclose or analyze the effects of unplugged idle wells or wells that have been temporarily plugged for multiple years. It does not disclose or analyze the effects of not

removing platforms. It does not disclose or analyze the effects of permitting nearly all pipelines to be decommissioned in place. It does not disclose or analyze the effects of permitting deviations from the existing regulations regarding decommissioning.

95. BOEM's webpage containing the 2005 programmatic analysis states that "[o]perators are required to return the seafloor back to its original state once they have completed their operations." It further states that "BOEM will analyze all of the applicable activities related to decommissioning operations as a single proposed action" under NEPA.

96. None of the existing programmatic NEPA analyses that BOEM has prepared on oil and gas lease sales held since 2005 examine the impacts of idle infrastructure or decommissioning in place. To the contrary, those environmental analyses expect that oil and gas infrastructure will be timely decommissioned to allow sites to be restored to their natural state. None of the analyses that Defendants have conducted on site-specific decommissioning activities disclose or analyze the cumulative impacts of Gulf oil and gas decommissioning or consider new information and changed circumstances relevant to Gulf oil and gas decommissioning.

97. Defendants do not have a categorical exclusion for oil and gas decommissioning activities. The Department of the Interior's Manual does not list these activities as categorically excluded. The Department of the Interior's regulatory list of categorical exclusions also does not include oil and gas decommissioning activities. *See* 43 C.F.R. § 46.210.

98. On information and belief, Defendants are relying on the 1987 PEA and 2005 PEA to approve permits allowing pipelines to be decommissioned in place, to approve extensions of time for oil and gas companies to comply with their decommissioning obligations, and to approve other deviations from the decommissioning regulations. For example, on information and belief, Defendants relied on these PEAs to approve permits to decommission pipelines in place in and

near Rice's whale habitat—a critically endangered species with only about 50 individual whales remaining. This includes pipeline segment 18755 approved in April 2023; pipeline segment 4851 approved in March 2023; pipeline segment 5890 approved in January 2023; pipeline segment 14358 approved in October 2022; pipeline segments 6167, 13301, and 13303 approved in March 2022; pipeline segment 12785 approved in January 2022; pipeline segments 8585 and 8586 approved in December 2021; pipeline segment 10451 approved in June 2021; pipeline segment 19050 in January 2021; pipeline segment 4871 approved in November 2020; pipeline segment 12300 approved in October 2020; and pipeline segment 13735 approved in May 2019. On information and belief, Defendants also relied on the 1987 PEA and 2005 PEA to approve the decommissioning of pipelines in place in shallower waters close to national wildlife refuges, such as pipeline segment 6782 approved in August 2020; pipeline segment 10140 approved in February 2020; pipeline segment 19487 approved in June 2019; and pipeline segment 9979 approved in January 2019. On information and belief, Defendants also relied on the 1987 PEA and 2005 PEA to approve more than 2,700 alternative compliance, departures, and time extensions from the decommissioning regulations between June 15, 2020, and March 31, 2024.

99. Defendants' program of Gulf oil and gas decommissioning is ongoing and incomplete. For example, a BSEE dashboard shows 297 structures on terminated leases as of May 21, 2024, and numerous others on the horizon. One study estimated that by 2027, between 704 and 1,199 structures will be due for decommissioning. BSEE anticipates accelerating trends in the volume of shallow water infrastructure in the Gulf of Mexico coming due for decommissioning. And Defendants continue to permit new in-place decommissioning, temporary abandonment, and continue to issue waivers from the decommissioning regulations in reliance on the 2005 PEA and 1987 PEA.

100.    Gulf oil and gas decommissioning has occurred, and is occurring, in a manner not contemplated under Defendants' prior NEPA analyses on Gulf oil and gas decommissioning.

101.    Together, all this means that Defendants have never examined the numerous harms from the idle infrastructure littering the Gulf of Mexico. Failing to examine the environmental impacts from idle infrastructure deprives the public and decisionmakers of this vitally important information and exacerbates the numerous risks inherent in offshore oil and gas drilling activity.

## CLAIM FOR RELIEF

## Violation of NEPA and the APA: Failure to Supplement NEPA Analyses

102.  Plaintiff realleges and incorporates the allegations in Paragraphs 1 through 101 of this Complaint as though set out in full.

103.  NEPA requires federal agencies to take a "hard look" at the direct, indirect, and cumulative effects of major federal actions, and at alternatives to the action that could reduce or eliminate those effects. 42 U.S.C. § 4332(C); 40 C.F.R. §§ 1508.1(i), 1501.5(c)(2).

104.  An agency has a continuing obligation to comply with NEPA and has a mandatory, discrete duty to supplement an already completed analysis when "a major Federal action is incomplete or ongoing and" either "[t]he agency makes substantial changes to the proposed action that are relevant to environmental concerns" *or* "substantial new circumstances or information" arises "about the significance of adverse effects." 40 C.F.R. § 1502.9(d)(1); *see also id.* § 1501.5(h)(1).

105.  Gulf of Mexico oil and gas decommissioning is a major federal action within the meaning of NEPA. It has been nearly two decades since Defendants completed their 2005 PEA on Gulf of Mexico oil and gas decommissioning and nearly four decades since Defendants

completed their 1987 PEA. The information and analysis in those documents are outdated. Defendants can no longer reasonably rely on those NEPA documents.

106.  Gulf of Mexico oil and gas decommissioning is ongoing and incomplete; there remains a federal action to occur. And there have been both substantial changes in the proposed action and substantial new circumstances and information bearing on the significance of the environmental effects of Gulf oil and gas decommissioning.

107.  First, Defendants have made substantial changes to Gulf oil and gas decommissioning since their 1987 and 2005 PEAs that are relevant to environmental concerns. This includes, for example, Defendants permitting over 97 percent of pipeline mileage in the Gulf of Mexico—or roughly 18,000 miles—to remain on or beneath the seafloor. The 1987 and 2005 PEAs did not disclose or analyze the effects of unplugged idle wells, the effects of wells being temporarily plugged for decades, the effects of idle platforms and other facilities, or the effects of Defendants permitting thousands of deviations from the decommissioning regulations.

108.  Second, there are substantial new circumstances and information about the significance of Gulf of Mexico oil and gas decommissioning. The 2005 PEA and 1987 PEA on Gulf of Mexico oil and gas decommissioning did not consider the extent of Gulf oil and gas infrastructure that is idle and not decommissioned within the required timeframes. Those analyses did not consider new information and changed circumstances regarding the significant risks that idle infrastructure and decommissioning in place pose to the environment. This new information incudes, but is not limited to, new information regarding the risk of oil spills and other accidents from idle infrastructure, new information regarding methane emissions from unplugged and temporarily plugged wells, and new information regarding the risks to wildlife posed by idle infrastructure, including species protected under the Endangered Species Act.

These include species that were not protected under the Endangered Species Act at the time Defendants completed their 2005 PEA, including the Rice's whale, eastern black rail, black-capped petrel, giant manta ray, oceanic whitetip shark; and pillar, lobed star, mountainous star, boulder star, and rough cactus corals.

109.  NEPA and its implementing regulations require Defendants to supplement their PEAs on Gulf of Mexico oil and gas decommissioning. Defendants' failure to prepare a supplemental NEPA analysis of their 1987 PEA and 2005 PEA constitutes agency action that is "unlawfully withheld" and/or "unreasonably delayed" under the APA. 5 U.S.C. § 706(1).

110.  Defendants cannot continue to rely on the 1987 PEA and 2005 PEA to approve permits to decommission in place, time extensions, and other deviations from the existing decommissioning regulations without supplementing their existing NEPA analyses or preparing a new NEPA analysis that comprehensively examines the impacts of Gulf decommissioning. Defendants' continued reliance on the 1987 PEA and 2005 PEA in taking such actions violates NEPA, its implementing regulations, and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or made "without observance of procedure required by law" under the APA. 5 U.S.C. § 706(2)(A), (D).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

1.  Declare that Defendants are in violation of NEPA, its implementing regulations, and the APA by failing to supplement their programmatic NEPA documents on Gulf oil and gas decommissioning and by continuing to rely on the 1987 and 2005 PEAs;

2.  Order Defendants to complete the required NEPA analysis by a date certain;

3.  Award Plaintiff its costs of litigation, including reasonable attorneys' fees; and

4.  Grant such other relief as the Court deems just and proper.


Respectfully submitted this 11th day of July, 2024,

>/s/ Kristen Monsell
>Kristen Monsell (DC Bar No. CA00060)
>CENTER FOR BIOLOGICAL DIVERSITY
>1212 Broadway, Ste. 800
>Oakland, CA 94612
>(510) 844-7137 Telephone
>(510) 844-7150 Fax
>kmonsell@biologicaldiversity.org
>
>/s/ Miyoko Sakashita
>Miyoko Sakashita (DC Bar No. CA00061)
>CENTER FOR BIOLOGICAL DIVERSITY
>1212 Broadway, Ste. 800
>Oakland, CA 94612
>(510) 844-7108 Telephone
>(510) 844-7150 Fax
>miyoko@biologicaldiversity.org
>
>/s/ David Derrick
>David Derrick (*pro hac vice* forthcoming)
>CENTER FOR BIOLOGICAL DIVERSITY
>1212 Broadway, Ste. 800
>Oakland, CA 94612
>(510) 844-7135 Telephone
>(510) 844-7150 Fax
>dderrick@biologicaldiversity.org
>
>*Attorneys for Plaintiff*