**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **CENTER FOR BIOLOGICAL DIVERSITY**, |
| Plaintiff, |
| v. |
| **DOUG BURGUM**, *et al.*, |
| Defendants. |

Case No. 1:24-cv-02014 (TNM)

## MEMORANDUM OPINION

Producing oil and gas at sea requires infrastructure like platforms, wells, and pipelines. The Department of the Interior regulates what oil and gas leaseholders must do to decommission that infrastructure.  To help inform its leasing and enforcement decisions, Interior prepared two programmatic environmental assessments on decommissioning structures in the waters off the Gulf Coast.  The Center for Biological Diversity considers these documents outdated because they do not adequately address the recent accumulation of abandoned oil and gas structures there.  Invoking the Administrative Procedure Act, the Center seeks to compel the Secretary of the Interior and two of his bureau directors (together, "the Secretary") to update their environmental analysis.[1]

Although the Center has standing to sue, it falters on the APA merits.  In short, the Center fails to establish a discrete and mandatory duty that this Court could order the Secretary to

---

[1]  Doug Burgum, the current Interior Secretary, is substituted for his predecessor as a defendant. *See* Fed. R. Civ. P. 25(d).  So are Directors Matthew Giacona (Bureau of Ocean Energy Management) and Kenneth Stevens (Bureau of Safety and Environmental Enforcement).

perform.  Its lawsuit also presents an impermissible programmatic challenge.  The Court will thus grant summary judgment for the Secretary.

**I.**

**A.**

The Gulf hosts around 97 percent of U.S. oil and gas production on the "Outer Continental Shelf," an area that begins at the outer edge of state waters and extends outward to the limits of federal jurisdiction.  *See* 43 U.S.C. § 1331(a); Defs.' Answer, ECF No. 14, ¶ 65. Congress set the framework for these production activities in the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331–1356c.  Among other things, the statute demands that oil and gas production be "subject to environmental safeguards."  *Id.* § 1332(3).  OCSLA empowers the Secretary of the Interior to regulate oil and gas leasing on the Outer Continental Shelf.  *Id.* § 1334(a).  He has delegated his authority to two subordinate agencies: the Bureau of Ocean Energy Management, which deals with front-end leasing, and the Bureau of Safety and Environmental Enforcement, which handles back-end compliance and enforcement.  Dep't of Interior, Secretarial Order No. 3,299 (May 19, 2010).  These two agencies took over the powers and responsibilities of the now-defunct Minerals Management Service.  *Id.*

Interior's regulations dictate how leaseholders must decommission their oil and gas infrastructure.  *See* 30 C.F.R. §§ 250.1700–1754.  "Decommissioning" is the process of "[e]nding oil, gas, or sulphur operations" and "[r]eturning the lease, pipeline right-of-way, or the area of a right-of-use and easement to a condition that meets [regulatory] requirements."  *Id.* § 250.1700.  Depending on the circumstance, the regulations demand actions like plugging wells, *id.* §§ 250.1710–1723, removing platforms and other facilities, *id.* §§ 250.1725–1731, clearing sites for wells, platforms, and other facilities, *id.* §§ 250.1740–1743, and decommissioning

2

pipelines, *id.* §§ 250.1750–1754.  All decommissioning actions require the Bureau of Safety and Environmental Enforcement's approval.  *Id.* § 250.1703(a).

As in many environmental cases, the National Environmental Policy Act is also at play. "NEPA is a procedural cross-check, not a substantive roadblock."  *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 173 (2025).  It requires federal agencies to prepare an environmental impact statement ("EIS") for each "major Federal action[] significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  A "major Federal action" is one "that the agency . . . determines is subject to substantial Federal control and responsibility." *Id.* § 4336e(10)(A).  The EIS must describe, among other things, the "reasonably foreseeable environmental effects of" and "a reasonable range of alternatives to the proposed agency action." *Id.* § 4332(2)(C)(i), (iii).  At the threshold, an agency may prepare an environmental assessment ("EA") to determine whether a proposed action calls for an EIS.  *Id.* § 4336(b)(2).  The EA must concisely "set forth the basis of [the] agency's finding of no significant impact or determination that an environmental impact statement is necessary."  *Id.*

An agency may prepare these documents at a programmatic level.  That analysis focuses not on an individual action but instead covers "all or some of the environmental effects of a policy, program, plan, or group of related actions."  *Id.* § 4336e(11); *see also id.* § 4336b. Agencies may then "make decisions based on the programmatic EA or programmatic EIS, as well as decisions based on a subsequent (also known as tiered) NEPA review."  Council on Env't Quality, *Final Guidance for Effective Use of Programmatic NEPA Reviews*, 79 Fed. Reg. 76,986, 76,986 (Dec. 23, 2014).  The programmatic approach's goal is "clearer and more transparent decision-making, as well as provid[ing] a better defined and more expeditious path toward decisions on proposed actions."  *Id.*

Most important to this dispute are two programmatic EAs ("PEAs") that the Minerals Management Service prepared in 1987 and 2005, respectively.  The 1987 document aimed to "assess the spectrum of potential impacts associated with the removal of structures" in the Gulf. Defs.' Ex. 1, ECF No. 22-2, at 1; *see also id.* at 5–37.  This would allow the 1987 PEA to "serve as the base document" for "Site-Specific Environmental Assessment[s]" that would "be prepared for each structure-removal proposal." *Id.* at 1.

In 2005, the agency followed up with a new PEA on decommissioning.  The updated document set out to examine new decommissioning technologies and regulatory requirements, as well as the environmental consequences of expanded deepwater drilling.  Defs.' Ex. 2, ECF No. 22-3, at 2–3.  The agency's "evaluation encompasse[d] all structure-removal operations" under its regulatory purview. *Id.* at iii.  Like its 1987 forebear, the 2005 PEA envisioned that its "general scope . . . w[ould] aid in its role as a reference document for future, tiered [site-specific EAs]; allowing their analyses to focus on site-specific issues and the potential impacts related to individual removal activities." *Id.* at 39.  The Minerals Management Service concluded its analysis by finding that "the structure-removal activities evaluated in the EA w[ould] not significantly affect the quality of the human environment" and thus issued a Finding of No Significant Impact. *Id.* at iii.  The agency also stated that the 2005 PEA's proposed "mitigation measures . . . w[ould] be required for all structure-removal operations in all water depths in the [Gulf's] Western and Central Planning Areas and the currently-available lease sale area of the Eastern Planning Area." *Id.*

**B.**

Against this backdrop, consider the Center for Biological Diversity's lawsuit.  The Center describes itself as "a national conservation organization that advocates for the protection of

threatened and endangered species and their habitats through science, law, and policy." Compl., ECF No. 1, ¶ 14.  At its core, the Center's action seeks to compel the Secretary to update his 2005 PEA in response to the "substantial changes to Gulf oil and gas decommissioning" and the "environmental concerns" they raise.  *See id.* ¶¶ 107–10.

The Center contends that the Gulf has become "an oil and gas junkyard."  Pl.'s Mot. Summ. J., ECF No. 21-1, at 24.  It points to "recent reports [that] reveal that thousands of wells and hundreds of platforms were overdue for decommissioning as of 2023."  *Id.* at 15.  The Center faults Interior for "permitt[ing] thousands of miles of out-of-use pipelines to be left on the seafloor."  *Id.*  According to the Center, "this delinquent and decommissioned-in-place infrastructure creates substantial risks to the Gulf, including oil spills, methane leaks, and the leaching of toxic chemicals."  *Id.*  Those risks are especially acute for "the wildlife that live[s] in, migrate[s] through, and otherwise rel[ies] upon the Gulf"—including marine mammals like the sperm whale and West Indian manatee, sea turtles, fish like the oceanic whitetip shark and the giant manta ray, and birds like the whooping crane and eastern black rail.  *Id.* at 35–38.

The Center asserts that Interior has under-studied these concerns.  The 2005 PEA is deficient because it "assumed that . . . infrastructure would be decommissioned instead of being left to deteriorate."  *Id.* at 16; *see also id.* at 23 (citing Pl.'s Ex. 3, ECF No. 21-2, at 41).  To the Center, this means that the Secretary's current leasing decisions "ignore the environmental implications of widespread decommissioning delays."  *Id.* at 16.  The Center thus asks this Court to compel the Secretary "to supplement [his] existing NEPA analysis to consider the environmental impacts of delayed decommissioning and extensive approval of decommissioning in place."  *Id.*  To that end, the Center invokes the Administrative Procedure Act, which states that "reviewing court[s] shall . . . compel agency action unlawfully withheld or unreasonably

delayed." 5 U.S.C. § 706; *see* Compl. ¶ 109. The parties have each moved for summary judgment, and those motions are now ripe.

## II.

Federal courts "possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). The Court thus must satisfy itself that it has jurisdiction and dismiss the action if it does not. *Moms Against Mercury v. FDA*, 483 F.3d 824, 826 (D.C. Cir. 2007); *see also* Fed. R. Civ. P. 12(h)(3). The plaintiff bears the burden of establishing jurisdiction. *Kokkonen*, 511 U.S. at 377.

For cases within the Court's jurisdiction, "[s]ummary judgment serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *AID Atlanta, Inc. v. Dep't of Health & Hum. Servs.*, 340 F. Supp. 3d 1, 4 (D.D.C. 2018) (cleaned up). The APA grants judicial review to persons "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. "Agency action" comprises "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 551(13). The statute directs that courts shall "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1). "[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004).

## III.

The two issues before the Court are the Center's standing and the APA merits. The Center survives on the former but loses on the latter. The Court examines each in turn.

**A.**

"Article III standing is a bedrock constitutional requirement . . . ." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024) (cleaned up).  As the party invoking the Court's jurisdiction, the Center "must demonstrate standing to do so." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013).  Because the Center is suing on its members' behalf, Compl. ¶ 14, it must establish that "[1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the [Center's] purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

The Secretary quarrels only with the Center's showing on prong one.  *See* Defs.' Mot. Summ. J., ECF No. 22, at 20–25.  Rightly so:  This lawsuit is germane to the Center's purpose of protecting the Gulf's wildlife, particularly the "species affected by offshore oil and gas activities," Galvin Decl., ECF No. 21-3, ¶ 3, and it does not demand the individual members' participation.  *See Laidlaw*, 528 U.S. at 181.  So the Court turns to whether at least one of the Center's members would have standing to sue—whether he suffered "an injury [that is] concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (cleaned up).

Binding caselaw further articulates what it takes to meet the standing elements for the "archetypal procedural injury" that the Center alleges.  *See WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013) (describing "an agency's failure to prepare (or adequately prepare) an EIS" as "the archetypal procedural injury" (cleaned up)).  As to injury, the Center must show that the Secretary's "failure demonstrably increased some specific risk of environmental harms that imperil [its] members' particularized interests in a species or habitat

with which the members share a geographic nexus." *Growth Energy v. EPA*, 5 F.4th 1, 27 (D.C. Cir. 2021) (per curiam) (cleaned up). The Center's members can do so by "aver[ring] that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Laidlaw*, 528 U.S. at 183 (cleaned up). Next, "an adequate causal chain must contain at least two links: one connecting the omitted [PEA] to some substantive government decision that may have been wrongly decided because of the lack of a[] [PEA] and one connecting that substantive decision to the [Center's] particularized injury." *See Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 668 (D.C. Cir. 1996) (en banc). Finally, the "relaxed redressability requirement" requires showing that the Secretary "could change [his] mind" about the substantive decision if he "adequately consider[ed] each environmental concern." *WildEarth Guardians*, 738 F.3d at 306.

To support its standing, the Center offers declarations from two of its members. *See* Foster Decl., ECF No. 21-4; Reeves Decl., ECF No. 21-5. William Foster lives on Mustang Island, Texas, near Corpus Christi and regularly uses Corpus Christi Bay, Aransas Bay, the Intercoastal Waterway, and Port Aransas for "swimming, surfing, boogie boarding, fishing, and walking along the shore." Foster Decl. ¶¶ 5, 14–16. He has an interest in the Gulf's wildlife— including in observing birds like whooping cranes, *id.* ¶ 17, and in helping conserve sea turtles by conducting patrols during their nesting season, *id.* ¶¶ 6–13. Foster states that the Secretary's "failure to address or mitigate the impacts of idle offshore oil and gas infrastructure means more and more wells, platforms, and pipelines will leak and cause oil spills," which he says will "risk[] [his] personal health, the activities [he] love[s], and the sea turtles and other wildlife [he] work[s] to protect." *Id.* ¶ 16.

James Reeves, meanwhile, splits his time between Pensacola Beach and New Orleans. *See* Reeves Decl. ¶ 2. He routinely recreates in the Gulf Islands National Seashore, Perdido Key, Jean Lafitte National Preserve, Lake Pontchartrain, Dauphin Island, and the Santa Rosa Sound. *Id.* ¶¶ 4–6. "[T]he main reason [he] gets outdoors" is to observe Gulf wildlife like manatees, seabirds, dolphins, and sea turtles. *Id.* ¶¶ 5–9, 13. Reeves complains that the Secretary's failure to properly address delayed decommissioning threatens his various interests. *Id.* ¶¶ 10–12, 15.

How do these declarations measure up? The Court concludes that they suffice to confer standing. The Center has done enough to show injury, causation, and redressability under the governing standard for procedural injuries.

### i.

Look first at injury. In short, the Center's members say that they routinely visit areas across the Gulf and that both are involved in conserving its wildlife. They assert that the Secretary's refusal to grapple with overdue decommissioning threatens species in the areas they frequent. Although the Gulf is undoubtedly large, the Center still succeeds at establishing that the Secretary's "failure demonstrably increased some specific risk of environmental harms that imperil [its] members' particularized interests in a species or habitat with which the members share a geographic nexus." *See Growth Energy*, 5 F.4th at 27.

This case is a particularly close analogue to *Center for Sustainable Economy v. Jewell*, 779 F.3d 588 (D.C. Cir. 2015). That dispute involved another environmental organization's NEPA challenge to Interior's approval of a five-year leasing program for resource exploration and development in the Gulf and waters off the Alaskan coast. *Id.* at 595–96. Much like here, the environmental organization buttressed its associational standing with two member declarations. The first member was "a commercial shrimper in the Gulf" who also "ma[de]

significant recreational use of Gulf waters and coastlines." *Id.* at 596. The second said that he "ma[de] significant recreational use of Cook Inlet and other Alaskan waters." *Id.* Both maintained "that their economic and aesthetic interests would be harmed" by more leasing in the Gulf and Alaskan waters. *Id.* This was enough for standing. *Id.* at 596–97. As the court reasoned, "both individuals plan[ned] to continue using those specific marine and coastal ecosystems for commercial and recreational purposes during the years covered by the [leasing] [p]rogram." *Id.* at 596.

Other binding decisions confirm that the required "geographic nexus" can be capacious. In *WildEarth Guardians*, for example, the Circuit held that the environmental organizations had standing for their NEPA suit over coal mining leases where their members had attested to their "aesthetic interests in the [Wyoming] land surrounding the West Antelope II tracts and specific plans to visit the area regularly for recreational purposes." 738 F.3d at 305–06. And in *International Dark-Sky Association v. FCC*, 106 F.4th 1206 (D.C. Cir. 2024), the court greenlit a challenge to the FCC's license grant for a satellite system because the plaintiff's members were "stargazers and astronomers who 'use' the sky and whose aesthetic and recreational activities w[ould] be inhibited by light pollution from the satellites." *Id.* at 1217; *see also Growth Energy*, 5 F.4th at 27–28 (holding that environmental group had standing to sue over EPA rule setting annual renewable fuel volume targets where one member "stud[ied] the sturgeon that live in the Gulf" whose habitats the EPA rule would harm (cleaned up)); *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 62 (D.D.C. 2019) (ruling that "[w]hile it is true that [declarants] d[id] not state that they ha[d] visited or plan[ned] to visit *specific parcels* offered in the August 2016 lease sale, . . . such specificity is not necessary" where the affected area "cover[ed] thousands of acres" and could cause pollution "a hundred miles away" (cleaned up)).

The Secretary instead tries to liken this case to one of the Center's own recent losses. *See* Defs.' Mot. Summ. J. at 23–24. In *Center for Biological Diversity v. Department of the Interior*, 144 F.4th 296 (D.C. Cir. 2025), the Center launched an ambitious action challenging "more than 4,000 permits for oil and gas wells on public lands in the Permian Basin of southeast New Mexico and the Powder River Basin of northeast Wyoming." *Id.* at 300. The Center's standing theory was equally broad. "Rather than explain how one or more of the challenged permits would likely injure them," the Center "instead pursued an all-or-nothing theory that claim[ed] standing to challenge all the permits in the aggregate—whether for wells within a couple of miles from where they live, work, or play, or for those more than 50 miles away." *Id.*

The D.C. Circuit put the kibosh on that theory. The Center's chief shortcoming was that its members' declarations did not "allege[] whether or how the newly permitted wells will cause those harms at the locations they identif[ied] as where they live, work, or travel." *Id.* at 306. As the court emphasized, the Center could not "rely on allegations of the kinds of concrete harms generally associated with oil and gas extraction to challenge permits . . . across thousands of square miles of New Mexico and Wyoming without linking their experience of those harms to the challenged permits." *Id.* Nor could the Center overcome that deficit "by treating the permits as if they were a single action affecting" one large area. *Id.* at 309. After all, each permit was a "discrete agency action[]," *id.* at 300, and the Center had to "demonstrate standing for each claim it s[ought] to press," *id.* at 304 (cleaned up).

The Secretary's reliance on *Center for Biological Diversity* is understandable. The opinion contains language that weighs against the Center's standing here just as it did there. And yet, the Court concludes that this time is different—at least on standing. Rather than foil the Center's standing, the case underlines a key principle: In a NEPA suit, it matters which action

you challenge.  That takeaway reveals why the Center's present lawsuit is distinguishable from its prior one.  Here, the Center disputes only a single (in)action: the Secretary's failure to update the 2005 PEA.  Compl. ¶ 109; *see* 5 U.S.C. § 551(13) (stating that "[a]gency action" includes the "failure to act").  That challenge sweeps in all Gulf waters under the Secretary's leasing authority, mirroring the 2005 PEA's "general scope."  *See* Defs.' Ex. 2 at 39; *see also id.* at 4 (stating that the analyzed area "consists of all water depths of the [Gulf's] Central and Western Planning Areas . . . and a portion of the Eastern Planning Area").  In addressing similarly wide-ranging lawsuits, the D.C. Circuit has consistently endorsed the environmental plaintiffs' injury even where the relevant geographic area was expansive.  *See Ctr. for Sustainable Econ.*, 779 F.3d at 596–97; *WildEarth Guardians*, 738 F.3d at 305–06; *Int'l Dark-Sky Ass'n*, 106 F.4th at 1217.  A cognizable injury exists so long as the plaintiffs "aver[red] that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity."  *Laidlaw*, 528 U.S. at 183 (cleaned up).  The Center has cleared that hurdle, if narrowly.

**ii.**

Turn now to causation and redressability.

The Center has made causation's dual showing.  *First*, it has "connect[ed] the omitted [PEA] to some substantive government decision that may have been wrongly decided because of the lack of a[] [PEA]."  *See Fla. Audubon Soc'y*, 94 F.3d at 668.  As recently as 2024, the Secretary acknowledged that he "has managed well, pipeline, and structure decommissioning operations in accordance with the description of the proposed activities and impacts analysis outlined in the" 2005 PEA.  *See* Pl.'s Ex. 4, ECF No. 21-2, at 4-17.  That aligns with the 2005 PEA's original purpose of serving "as a reference document for future, tiered [site-specific

EAs]." *See* Defs.' Ex. 2 at 39.  The Secretary's continued reliance on the PEA thus may likely have contributed to his "approv[ing] more than 2,700 alternative compliance, departures, and time extensions from decommissioning requirements."  *See* Pl.'s Mot. Summ. J. at 25; Defs.' Answer ¶ 73.

*Second*, the Center has demonstrated a "link[]" between the Secretary's supposedly erroneous decommissioning decisions and its members' "particularized injury."  *See Fla. Audubon Soc'y*, 94 F.3d at 668.  It points to Interior's own website, *see* Pl.'s Ex. 9, ECF No. 21-2, which displays almost 1,300 structures dotting the Gulf Coast that are in various stages of the decommissioning process, Bureau of Safety & Env't Enf't, *Offshore Infrastructure Dashboard*, https://perma.cc/QA32-RCRZ (last visited Jan. 15, 2026).  Many of these structures intersect with the habitats of various animals, including whales and sea turtles.  *See* Compl. ¶ 86; Pl.'s Ex. 38, ECF No. 24-1.

More, the Center makes the common-sense point that pollution travels—as do the migratory species that it harms.  *Accord Sierra Club v. Nat'l Marine Fisheries Serv.*, 711 F. Supp. 3d 522, 529 (D. Md. 2024) (observing that the Deepwater Horizon spill "contaminated over 43,000 square miles of surface waters and over 1,300 miles of shoreline and killed or seriously harmed over 100,000 individuals of species listed as threatened or endangered").  All told, the Court finds that the Center has met the causation standard.  *See, e.g.*, *Ctr. for Sustainable Econ.*, 779 F.3d at 596 (endorsing causation where "[a] leasing program that used incomplete economic analyses that failed rationally to account for leasing's impact on the environment would harm [declarants'] concrete economic and aesthetic interests" in Gulf and Alaskan waters); *Growth Energy*, 5 F.4th at 29 (deeming causation requirement met where it was "substantially probable" that EPA's procedural failure resulted in crop production that

"adversely affected local conditions in Kansas, the Gulf, and the Mississippi River Basin, harming cranes and sturgeon to the detriment of [declarants]" (cleaned up)).

The Secretary has two main objections to the Center's causation theory. The first echoes his argument on injury. *See supra* at 11. In short, the Secretary insists on more granularity; he faults the Center for "fail[ing] to ground its claims in any specific decommissioning decisions." Defs.' Mot. Summ. J. at 24. But as above, this misconstrues the Center's action. The Center does not challenge any individual leasing or decommissioning decision. Its lawsuit is more far-reaching—and unavoidably so, since the document it wants the Secretary to update is programmatic. When addressing comparably broad challenges, the D.C. Circuit has approved causation where there was a probable link between the government action and the plaintiff's injury. *See Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 185 (D.C. Cir. 2017) (finding causation where there was a "substantial probability . . . that the EPA's registration of the pesticide w[ould] in fact create a demonstrable risk to the Center members' interests given . . . the geographical overlap between the habitats of the [insect] and acreage where [the pesticide] w[ould] most likely be used" (cleaned up)); *see also Ctr. for Sustainable Econ.*, 779 F.3d at 596; *Growth Energy*, 5 F.4th at 29. These decisions favor the Center.

Nor does the Secretary's second argument deal a fatal blow. He points the finger at oil and gas producers, whose "inaction" is the real reason for the Center's claimed injuries. *See* Defs.' Mot. Summ. J. at 24–25. "[T]o the extent [the Center's] members face any imminent injury at all," the Secretary maintains, "decisions by [him] to allow decommissioning in place or extensions are not the major cause." *Id.* at 25. But that argument does not change the fact that the Secretary—through his subordinate agencies—has full authority and control over leaseholders' decommissioning activities. *See supra* at 2. At the very least, then, the Secretary

has contributed to the Center's alleged injuries, and the caselaw demands nothing more.  *See, e.g.*, *Sierra Club v. FERC*, 827 F.3d 59, 67 (D.C. Cir. 2016) (holding that plaintiff had standing because "[e]ven if [he] would suffer a similar type of harm in the absence of the [government action], [it] w[ould] cause him to suffer an additional quantum of that harm").

That leaves redressability.  The Secretary does not address this prong.  *See* Defs.' Mot. Summ. J. at 20–25.  That is perhaps because causation and redressability are two sides of the same coin.  *See Fla. Audubon Soc'y*, 94 F.3d at 668 ("The first link in this causal chain foreshadows the issue of redressability.").  Here, the Center meets the "relaxed redressability requirement" by showing that the Secretary "could change [his] mind" about his decommissioning enforcement if he "adequately consider[ed] [the Center's] environmental concern[s]" in an updated PEA.  *See WildEarth Guardians*, 738 F.3d at 306.

*  *  *

That completes all three elements.  Even though the Center's lawsuit sweeps broadly, it has standing to bring it under the governing caselaw.  The Secretary's concerns about the action's breadth come to fruition not on standing but on the APA merits.  *See Campbell v. Clinton*, 203 F.3d 19, 23 (D.C. Cir. 2000) (directing against "conflat[ing] standing with the merits").  The Court now turns to those.

## B.

To recap, the APA states that courts shall "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  Such a claim "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*."  *Norton*, 542 U.S. at 64.  In other words, a § 706(1) action bears fruit only where it seeks "enforcement of

a specific, unequivocal command" or "the ordering of a precise, definite act about which an official ha[s] no discretion whatever." *Id.* at 63 (cleaned up).

Before examining the Secretary's supposed duty, the Court must first confront one threshold issue: whether § 706(1)'s requirements are jurisdictional. *See Moms Against Mercury*, 483 F.3d at 826. Neither the Supreme Court nor the D.C. Circuit has resolved this question. Some judges in this District have treated the failure to identify a discrete and mandatory duty under § 706(1) as a jurisdictional defect. *See, e.g.*, *Fort Sill Apache Tribe v. Nat'l Indian Gaming Comm'n*, 103 F. Supp. 3d 113, 119–20 (D.D.C. 2015); *Hamandi v. Chertoff*, 550 F. Supp. 2d 46, 49–50 (D.D.C. 2008). That conclusion finds backing in the mandamus setting, where the requirement to identify a "clear duty to act" is indeed jurisdictional. *See Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016); *see also Norton*, 542 U.S. at 63 (observing that "the APA carried forward the traditional practice . . . of mandamus").

And yet, *Norton* did not state that § 706(1) "carried forward" mandamus's jurisdictional aspect. *See id.* And there is reason to doubt it. After all, § 706(1) sits within the APA's judicial review provisions, which courts have long held "are not jurisdictional." *See Air Courier Conf. v. Am. Postal Workers Union*, 498 U.S. 517, 523 n.3 (1991); *Vietnam Veterans of Am. v. Shinseki*, 599 F.3d 654, 661 (D.C. Cir. 2010) (treating as "firmly established" the idea "that the review provisions of the APA are not jurisdictional"). The D.C. Circuit has likewise held that the "APA's final agency action requirement is not jurisdictional," *Trudeau v. FTC*, 456 F.3d 178, 184 (D.C. Cir. 2006), and, once again, "agency action" includes the "failure to act," 5 U.S.C. § 551. For these reasons, the Court holds that § 706(1)'s demand for a discrete and mandatory action is *not* jurisdictional. *Accord, e.g.*, *Friends of the Earth v. Dep't of Interior*, 478 F. Supp. 2d 11, 23, 26–29 (D.D.C. 2007); *Pate v. Fed. Bureau of Prisons*, No. CV 21-202 (RDM), 2021

WL 5038636, at *2–3 (D.D.C. Oct. 29, 2021), *aff'd*, No. 21-5285, 2023 WL 2436223 (D.C. Cir. Mar. 6, 2023).

**i.**

Having cleared that underbrush, the Court now considers the supposed duty to update the PEA.  Recall that NEPA requires federal agencies to prepare an EIS for any "major Federal action[] significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  In the alternative, the agency must complete an EA if the "proposed agency action . . . does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown."  *Id.* § 4336(b)(2).  The EA must explain "the basis of [the] agency's finding of no significant impact or determination that an environmental impact statement is necessary."  *Id.*

To be sure, an agency's environmental analysis sometimes needs a refresh.  In *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 (1989), the Supreme Court noted that "[t]he subject of postdecision supplemental environmental impact statements is not expressly addressed in NEPA."  *Id.* at 370 (footnote omitted).  Still, the Court maintained that "[p]reparation of such statements . . . is at times necessary to satisfy the Act's action-forcing purpose."  *Id.* at 371 (cleaned up).  For corroboration, the Court looked to regulations from the Council on Environmental Quality, which "impose[d] a duty on all federal agencies to prepare supplements to either draft or final EIS[s] if there 'are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.'"  *Id.* at 372 (quoting 40 C.F.R. § 1502.9(c) (1987)); *see also Norton*, 542 U.S. at 72–73 ("In *Marsh*, we interpreted § 4332 in light of this regulation to require an agency to take a 'hard look' at the new information to assess whether supplementation might be necessary." (quoting *Marsh*, 490 U.S. at

385)).[2]  Based on the statutory and regulatory sources, the Court held that "a supplemental EIS must be prepared" if two conditions are present: "[1] If there remains 'major Federal action' to occur, and [2] if the new information is sufficient to show that the remaining action will 'affect the quality of the human environment' in a significant manner or to a significant extent not already considered."  *Marsh*, 490 U.S. at 374 (cleaned up) (quoting 42 U.S.C. § 4332(2)(C)).

Later in *Norton*, the Court further etched out the duty to supplement.  The environmental groups in that case wanted to compel the Bureau of Land Management ("BLM") to supplement an EIS it had issued before approving a federal land-use plan.  *Norton*, 542 U.S. at 60–61.  The plaintiffs argued that NEPA required the agency to analyze the increased use of off-road vehicles in certain parts of the managed land.  *Id.*

The Supreme Court said no.  Writing for a unanimous Court, Justice Scalia acknowledged that "in certain circumstances an EIS must be supplemented."  *Id.* at 72 (citing *Marsh*, 490 U.S. at 370–74).  But the Court emphasized *Marsh*'s first prong—under which "supplementation is necessary only if there remains major Federal action to occur."  *Id.* at 73 (cleaned up) (quoting *Marsh*, 490 U.S. at 374).  "In *Marsh*, that condition was met:  The dam construction project that gave rise to environmental review was not yet completed."  *Id.*; *see Marsh*, 490 U.S. at 367.  By contrast, *Norton* found that BLM had already approved the land-use plan, and that approval was the "major Federal action requiring an EIS."  542 U.S. at 73 (cleaned up).  Because there were no proposed amendments or revisions to the land-use plan, there was "no ongoing major Federal action that could require supplementa[l]" NEPA analysis.  *Id.*

---

[2]  The Council on Environmental Quality recently rescinded its regulations implementing NEPA. *See Removal of National Environmental Policy Act Implementing Regulations*, 90 Fed. Reg. 10,610 (Feb. 25, 2025).

(cleaned up).  And *Norton* explained that plaintiffs alleging a failure to act must point to a

"*discrete* action."  *Id.* at 63.

The Center wants the Secretary to "supplement[] [his] existing NEPA analyses or

prepar[e] a new NEPA analysis that comprehensively examines the impacts of Gulf

decommissioning."  Compl. ¶ 110.  In other words, "Gulf decommissioning" as a whole is the

Center's proposed "ongoing major Federal action" that demands further environmental

assessment.  *See also, e.g.*, Pl.'s Mot. Summ. J. at 43 (contending that the Secretary has

"violat[ed] [his] statutory obligation under NEPA to take a 'hard look' at the environmental

consequences of Gulf oil and gas decommissioning activities").  Like the environmental groups

in *Norton*, the Center founders on *Marsh*'s first prong.  That is because it does not identify any

"ongoing major Federal action that could require supplementa[l]" NEPA analysis.  *See Norton*,

542 U.S. at 73 (cleaned up).[3]

In fact, the Center's shortcoming resembles the one the D.C. Circuit identified in *Western*

*Organization of Resource Councils v. Zinke* ("*WORC*"), 892 F.3d 1234 (D.C. Cir. 2018).  That

dispute involved the "Federal Coal Management Program" for which Interior had published a

PEIS in 1979.  *Id.* at 1236.  More than 30 years later, two environmental groups sued under

§ 706(1) to "compel[] the Secretary to update the Program's environmental impact

statement."  *Id.*

The D.C. Circuit held that there was no duty to do so.  In the court's eyes, "the

Department's NEPA obligation for the Federal Coal Management Program terminated with its

adoption in 1979."  *Id.* at 1243.  The panel declined the environmental groups' bid to redefine the

---

[3]  The Center's action thus fails even if *Marsh*'s holding remains intact after the rescission of the
regulation on which it relied.  *See supra* n.2.

relevant action "as encompassing the Program broadly, including the leases and orders that the Department issues on an ongoing basis." *Id.* "As [*Norton*] ma[de] clear, the fact that actions continue to occur in compliance with the Program does not render the original action incomplete." *Id.* Ultimately, the D.C. Circuit concluded that the plaintiffs "failed to identify any specific pending action, apart from the Program's continued existence, that qualifie[d] as a 'major Federal action' under NEPA." *Id.* That omission doomed their case—and the same is true here. Gesturing toward "Gulf decommissioning" writ large does not cut the mustard.

The Center insists that it is merely taking the Secretary at his word. It highlights language from the 2005 PEA, which "purports to analyze 'all of the applicable activities related to [Gulf] decommissioning operations as a single proposed action.'" Pl.'s Reply, ECF No. 25, at 31–32 (quoting Pl.'s Ex. 3 at 4)). But this single quotation cannot salvage the Center's case. A stray description of the Secretary's programmatic scheme as a "single" action cannot transform it into one. To repeat, the APA defines "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). "All of those categories involve circumscribed, discrete agency actions . . . ." *Norton*, 542 U.S. at 62. By contrast, NEPA envisions PEAs as being true to their "programmatic" moniker—"analyzing all or some of the environmental effects of a policy, program, plan, or *group of related actions*." 42 U.S.C. § 4336e(11) (emphasis added). Both the APA and NEPA thus foreclose the Center's attempt to convert multiple actions into one.

More, the Center's blunderbuss approach does not match the Secretary's actual practice. In reality, "Gulf decommissioning" breaks down into many discrete agency actions—including, for example, granting a lease or approving an oil producer's decommissioning application. *See* 5 U.S.C. § 551(13). The 2005 PEA reflects that fact in announcing that it would "serv[e] as a

reference document" for "future, site-specific environmental assessments (SEAs)."  Pl.'s Ex. 3 at 3; *see also id.* at 39 ("The general scope of this PEA will aid in its role as a reference document for future, tiered SEA[s]; allowing their analyses to focus on site-specific issues and the potential impacts related to individual removal activities."); *id.* at F-3 ("Site-specific [NEPA] analyses will be conducted on individual applications . . . .").  The Secretary continues to conduct SEAs for individual decommissioning applications.  *See, e.g.*, Defs.' Ex. 5, ECF No. 22-6 (2024 SEA of operator's "Structure Removal Application").

In sum, § 706(1) springs into action only upon a "specific, unequivocal command."  *Norton*, 542 U.S. at 63 (cleaned up).  The Center tries to meet that burden by invoking *Marsh*'s interpretation of NEPA's duty to supplement.  But that effort would succeed only if the Center also identified an "ongoing major Federal action" to trigger the need for a supplemental environmental assessment.  *See id.* at 73 (cleaned up).  The Center fails on that front, so its lawsuit cannot stand.

### ii.

The Center's action also falls flat under a related doctrine that governs APA suits more broadly: the prohibition against "programmatic" challenges.

The Supreme Court applied the doctrine in *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990).  In that case, an environmental organization sued BLM under the APA and NEPA over its "land withdrawal review program."  *Id.* at 875.  The lawsuit cobbled together various agency rules and decisions covering "vast expanses of territory," complaining, for instance, about BLM's "failure to revise land use plans in proper fashion, failure to submit certain recommendations to Congress, failure to consider multiple use, . . . [and] failure to provide adequate environmental impact statements."  *Id.* at 891–92.  The Court rebuffed the suit.

After all, under the APA, plaintiffs "must direct [their] attack against some particular 'agency action' that causes [them] harm." *Id.* at 891; *see* 5 U.S.C. § 702. This requirement forbade the environmental organization from lumping together "many individual actions" into one "program" and seeking "wholesale correction under the APA." *Lujan*, 497 U.S. at 892–93; *see also Norton*, 542 U.S. at 64 ("The limitation to discrete agency action precludes the kind of broad programmatic attack we rejected in [*Lujan*]."). The Court instead pointed the plaintiff to "the offices of the Department or the halls of Congress, where programmatic improvements are normally made." *Lujan*, 497 U.S. at 891.

So too here. Under the "Gulf decommissioning" banner, the Center jumbles together a boatload of individual agency actions. That is exactly the move that *Lujan*—and the APA— forbids. *Accord Mass. Coal. for Immigr. Reform v. DHS*, 621 F. Supp. 3d 84, 97 (D.D.C. 2022) (dismissing programmatic NEPA challenge to various Biden Administration immigration actions); *Assoc. for Educ. Finance and Policy v. McMahon,* 786 F. Supp. 3d 13, 22 (D.D.C. 2025) (describing the APA as a "remedial scalpel," not a tool to "bludgeon through broad programmatic attacks").

Nor does it help that the Center's lawsuit travels under § 706(1). The D.C. Circuit has applied *Lujan* in that setting. In *American Forest Resource Council v. United States*, 77 F.4th 787 (D.C. Cir. 2023), the plaintiffs tried to deploy § 706(1) to force BLM to sell or offer to sell a certain volume of timber each year. *Id.* at 804. The Circuit found this request "analogous to the sort of broad programmatic attack the Supreme Court rejected in [*Lujan*]." *Id.* at 805 (cleaned up). As the court highlighted, "[t]he total timber volume the BLM offers for sale in a given year is . . . not a discrete agency action" but instead represented "a measurement—a synthesis of multiple sales made over several years." *Id.* The plaintiffs' action thus was "targeted

at . . . years' worth of policy choices and site-specific decisions." *Id.* (cleaned up).  The Circuit concluded that this "challenge to the BLM's program," like that in *Lujan*, belonged in "'the offices of the Department or the halls of Congress,' not at the court." *Id.* (quoting *Lujan*, 497 U.S. at 891); *see also Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1011 n.6 (9th Cir. 2021) (rejecting plaintiffs' effort to "compel DHS to perform [] environmental assessments" for several immigration programs because "a plaintiff cannot obtain judicial review by simply recasting his or her challenge 'in terms of agency action unlawfully withheld under § 706(1), rather than agency action not in accordance with law under § 706(2)'" (cleaned up) (quoting *Norton*, 542 U.S. at 64–65)).  The Center's lawsuit suffers the same fate.

## IV.

In the end, the APA blocks the Center's action twice over.  The Center does not clear § 706(1)'s high bar for discrete and mandatory actions.  It also bumps up against the APA's broader barrier against programmatic challenges.  These limitations "protect agencies from undue judicial interference with their lawful discretion" and "avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Norton*, 542 U.S. at 66.  The Center has other paths to prevent the Gulf from becoming an "oil and gas junkyard":  It can petition the agency, lobby Congress, or presumably even sue over individual leasing or decommissioning decisions. *See WORC*, 892 F.3d at 1244.  But the Center cannot save the Gulf in one fell swoop—at least before this Court.

For all these reasons, the Court will enter summary judgment for the Secretary.  A separate Order will issue.

Dated: January 23, 2026

_____
TREVOR N. McFADDEN, U.S.D.J.